# CASES

IN THE

# SUPERIOR COURT

OF

# PENNSYLVANIA.

---

### Samuel v. de la Sota, Appellant.

*Contracts—Sale—Breach—Measure of damages.*

Where the purchaser of a staple commodity such as iron ore wrongfully refuses to accept and pay for what he has purchased, he will ordinarily be liable for the difference between the contract price and the market price of the iron ore at the time he should have accepted it; and he cannot be held liable for a profit in excess of such difference, which the seller might have made, if the ore had been accepted, unless it is shown that at the time of the purchase he had knowledge of the contract under which the seller could have made such a profit.

Argued Dec. 16, 1912. Appeal, No. 230, Oct. T., 1912, by defendants, from judgment of C. P. No. 4, Phila. Co., Sept. T., 1908, No. 282, on verdict for plaintiffs in case of Frank Samuel, and Silas M. Tomlinson, trading as Frank Samuel, v. Raman de la Sota and Luis Maria de Aznar, trading as Sota & Aznar. Before HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Assumpsit for breach of contract. Before AUDENRIED, J.

At the trial the court directed a verdict for plaintiff. Subsequently the court discharged a rule for a new trial.

AUDENRIED, J., filed the following opinion:

The plaintiffs claim from the defendants $776, with in-terest from October 1, 1906, and $602.21 with interest from March 8, 1907. The validity of these claims is conceded, but the defendants present a counterclaim for damages resulting to them from the plaintiffs' breach of a certain contract for the purchase of iron ore from them. The nonperformance by the plaintiffs of this contract is admitted. Unless, however, the defendants have sus-tained more than nominal damages through the default of the plaintiffs, the latter are entitled to recover their claim in full. The point on which the case turns is the question as to what is the proper measure of the de-fendants' damages applicable to the facts as developed at the trial.

A general discussion of the law relating to the right of the seller to damages where the buyer unjustifiably neglects or refuses to accept and pay for the goods that he has purchased, is unnecessary. The opinion of the Superior Court (41 Pa. Superior Ct. 630) per ORLADY, J., in affirming the refusal of this court to enter judgment against these defendants for want of a sufficient affi-davit of defense contains a clear statement of the result of the best-considered decisions on the subject. It was said by that court that in such a case the vendor is entitled to · recover all his damages, including gains prevented as well as losses sustained, and that the appli-cation of this broad rule is subject to two conditions only. In order to be recoverable, damages, in the first place, must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, and, in the second place, must be certain both in their nature and in respect to the cause from which they proceed. The case resolves itself into the simple question of the correct application of this rule.

The injurious effect complained of by the defendants as the result of the plaintiffs' failure to carry out their

contract for the purchase of the ore is the loss of the profit that would have been made had that contract been duly performed.  It was in evidence at the trial that it had been intended by the defendants that the 13,000 tons of ore that they agreed to deliver to the plaintiffs was to be supplied out of 30,000 tons of ore that they had agreed to buy from Chavarri, Lecoq & Co.  This ore they were bound to " lift " at Garrucha in Spain, where it was mined, before March 1, 1907. The price that they were to pay for it, plus commissions and the expense of loading it, made its cost 10s. 6d. per ton.  They agreed to sell Chavarri mine ore to the plaintiffs, for delivery in the last three months of 1906, at 11s. 3d. per ton, f. o. b. Garrucha.  Their profit, if both contracts had been carried out, would have been 9d. per ton and on 13,000 tons would have amounted to $2,379.

Applying now to the defendants' set-off the touch-stone supplied by the Superior Court, does it meet the requirements of the two fundamental conditions laid down for the recognition of damage claims in cases of this character?  If it does, the case should have gone to the jury in order that they might say whether they believed the testimony upon which in part it rested.  If it does not, the direction of a verdict for the plaintiffs was not erroneous and the case may be regarded as properly disposed of.

That the damages claimed by the defendants were not barred by the second condition referred to in the rule laid down by the Superior Court is plain.  They lacked nothing in certainty so far as their nature was concerned. The defendants demanded allowance for the loss of the profit that they had anticipated under their contract with the plaintiffs.  About this there was nothing contingent or speculative.  It was clearly shown how much the defendants would have gained on their resale to the plaintiffs had the latter taken and paid for the ore that they had agreed to buy.  The loss of this profit was the

direct and proximate result of the plaintiffs' default. Nothing else prevented the defendants from pocketing a gain of $2,379.

But did this loss enter into the contemplation of these parties where the contract was made as a natural consequence of its possible breach by the vendees? In general, the law considers that the parties to a sale of such a staple commodity as iron ore have in mind that the only result of the buyer's failure to perform his part will be the sale of the goods in the market and the payment by him to the seller of the excess of the contract price over the price there realized. If any other consequences are to be held to have been contemplated as the result of the breach of such a contract by the vendee, special circumstances must appear, and it must be shown that of these both parties to it were aware at the moment when their minds met and the contract was made. The burden of showing such special circumstances and the parties' knowledge of them lies on that party who claims the right to measure his damages by a standard other than that supplied by the difference between the contract price and the market value of the goods.

Unless, therefore, the defendants' evidence at the trial failed to show not only their own intention to fulfill their contract with the plaintiffs by delivering ore that they had the right to demand from a third person, provided their demand was made before a certain date, and that the other conditions of their arrangement with that party were complied with, but which they did not then have in their actual possession, but also that the plaintiffs were informed of these special circumstances, their counterclaim failed absolutely, since the only difference between the price fixed on the ore by their contract with the plaintiffs and its market value after December 31, 1906, that was shown (if, indeed, it can be said that there was any evidence on that point) was in the plaintiffs' favor.

The contract in relation to the 13,000 tons of ore was

made by an exchange of cablegrams and was closed on September 19, 1906. It is, therefore, with the question of the plaintiffs' knowledge on that date that we are concerned, although the written memorandum of the purchase was probably signed by them somewhat later.

Did the plaintiffs then know what particular ore the defendants expected to deliver to them and the character of the latter's interest at that time in such ore; or, in the absence of actual knowledge of these facts on the part of the plaintiffs, did the evidence at the trial indicate that the circumstances under which the contract was negotiated were such that the jury might have found that they were chargeable with notice of the defendants' position?

It was proved that the contract for the sale of the ore had been made by cable. It was in evidence that Benjamin G. Harrison had acted for the defendants and Frank Samuel for the plaintiffs in its negotiation. Mr. Harrison testified that the firm of Sota & Aznar are engaged in the business of buying and selling iron ore; that they own shipyards, have a large fleet of steamers, and are concerned in insurance and banking. Mr. Samuel admitted that when the contract was entered into he knew that the defendants did not own the Chavarri mines at Garrucha and that the ore from there that they sold must be obtained by them from the mine owners, but denied that he knew when he accepted the defendants' offer of ore anything about the contract under which, it seems, they expected to obtain it for delivery to his firm. No one else except Mr. Harrison knew what information had been communicated on this subject to Mr. Samuel during the negotiations, if there were any, that preceded the exchange of cablegrams resulting in the contract, and Mr. Harrison gave no testimony on that point. The cablegrams in evidence do not throw light on the question. In a letter from the defendants dated September 19, 1906, reference is made to the boom in iron ore, "especially in the imagi-

nation of the Spanish mine owner," and to the consequent necessity that the plaintiffs should " lift " the ore that they had bought strictly in accordance with the contract. But if this letter is open (and in our opinion it is not) to the construction that the defendants intended to imply that the only interest that they had in the ore that they had agreed so sell was by way of a contract for its delivery to them by another firm, it must be remembered the plaintiffs received it more than a week after their contract with the defendants had been closed and that its incidents had then already become fixed. The date when the contract was made is the all important one in connection with this inquiry. The knowledge that the plaintiffs acquired on this subject subsequently is not material. The court has been unable to discover in all this (and there was nothing else that bore even remotely on the question) any evidence upon which the jury should have been allowed to find that when their contract was made the plaintiffs knew, actually or constructively, that the defendants were other than the absolute owners in possession of the ore that they undertook to sell and deliver. They knew that the defendants did not own the Chavarri mines and that as middlemen it was their business to buy ore to sell again, but this was far short of knowledge on the plaintiffs' part that the ore that they were buying had not been paid for by their vendors, that it had not even been mined and that unless the defendants took it from the wharf at Garrucha before March 1, 1907, they would have no right to demand it from Chavarri, Lecoq & Co.

It is argued that because the vendors were known to be dealers in ore, the plaintiffs ought to have guessed that having agreed to sell 13,000 tons of it to them, the defendants would turn round and buy from some one else at a lower price what was needed to fill the contract, and that, therefore, the loss of the profit on such a transaction is the measure of damage here. To have guessed that would have been wide of the fact, since the

defendants appear to have already bought the ore before they agreed to sell it to the plaintiffs. This shows how broad a field of speculation as to the defendants' means of supply was open to the plaintiffs; but they were not bound to speculate on the subject. The evidence submitted at the trial disclosed no reason why on September 19, 1906, the plaintiffs should have anticipated that their breach of the contract that they then entered into would naturally lead to anything but the sale of the ore by the defendants to some one else at the market price and their own liability to pay the defendants the excess of the contract price over the market value of the ore as thus determined.

At this point it is suggested that, even if such was the case when the contract was originally made, there was subsequently a sort of novation under which later dates were fixed for the plaintiffs' acceptance of the ore. It is argued that when this substituted contract was made the plaintiffs were fully apprised of the defendants' situation, and that they are, therefore, bound to answer in damages for the special consequences of their failure "to lift" the ore within the time then agreed upon.

The answer to this specious argument is that the affidavit of defense and the defendants' notice of special matter go no farther than to assert that, "At the plaintiffs' request defendants negotiated with the said mine owners to postpone delivery of said ore until January or February, 1907," and stop short of a distinct averment of a new contract made between the parties by way of substitution for that of September 19, 1906, and that the evidence did not go beyond what was so guardedly alleged by the defendants.

It is true that the plaintiffs on several occasions requested an extension of the time for "lifting" the ore, and even offered to pay interest and storage charges if such a concession were accorded, but no definite and positive answer was ever given them, and never after the lapse of the time set for the taking of the ore by the

contract of September 19, 1906, did the plaintiffs have a legal standing to demand its delivery.

The delay of the defendants to enforce exact compliance with the contract was of mere grace. Their voluntary forbearance had no further effect upon the rights of the parties than to put the risk of the postponement of performance upon the shoulders of the plaintiffs. If the market value of the ore that the plaintiffs should have "lifted" had altered between the date for acceptance fixed by the contract, and the end of February, 1907, damages for their ultimate failure to carry out the contract might have been assessed, either as of the date when acceptance should have taken place, and when by nonperformance the contract was broken, or as of the time when the frivolity of their excuses exhausted the patience of the vendors and the latter definitely declared the contract off: Hickman v. Haynes, L. R. 10 C. P. 598; Ogle v. Earl Vane, L. R. 2 Q. B. 275, and L. R. 3 Q. B. 272.

The foregoing analysis of the evidence submitted at the trial has convinced us that the defendants' counterclaim is without legal foundation and that the case was correctly disposed of when the jury were directed to render a verdict in favor of the plaintiffs for the full amount of their claim.

The conclusion thus reached is not inconsistent with our refusal to enter judgment against the defendants for want of a sufficient affidavit of defense, and the decision of the Superior Court affirming the order discharging the rule for judgment. This becomes manifest on reference to the affidavit of defense. Its fourth paragraph begins with the words, "Chavarri's Garrucha iron ore, the subject of said contract of sale, was known by plaintiffs and defendants at the time of the execution of said contract to be iron ore mined by one Chavarri at his mines at Garrucha, Spain, and from him purchased by defendants and by them sold to plaintiffs." Then follows a summary of the terms of the contract between

the defendants and Chavarri's firm.   The averments of this paragraph read together were regarded both here and in the Superior Court as, in effect, imputing to the plaintiffs knowledge of the defendants' contract with Chavarri, Lecoq & Co.   If they are analyzed grammatically, it may seem that the construction placed upon them was a rather liberal one; but the technical nicety of expression found in the old pleadings is not expected in affidavits of defense, and nothing more than substantial certainty of averment is ever exacted in them.   Interpreted according to the rule applied in such cases what the defendants asserted in their affidavit was serious enough to prevent a summary judgment against them.   They have now had an opportunity to establish their counterclaim.   The evidence offered in its support has failed to sustain it.   We no longer hesitate to enter judgment against them, and the motion for a new trial is dismissed.

*Error assigned* was in giving binding instructions for plaintiffs.

*S. Heckscher,* of *Duane, Morris & Heckscher,* for appellants.—In an action by vendor of goods against vendee for breach of contract the general rule of damage is the difference between the contract price and the market value, because the vendor usually has possession of the goods he contracts to sell and can realize their market value; but where he has not possession, as where he must mine the minerals, or manufacture the goods, or procure them from third persons, this rule has no application: Samuel v. Sota, 41 Pa. Superior Ct. 630; Ridgeway Dynamo & Engine Co. v. Cement Co., 221 Pa. 160; Scott v. Kittanning Coal Co., 89 Pa. 231; Mayer Brick Co. v. Kennedy, 230 Pa. 98; Winslow Bros. Co. v. DuPuy, 208 Pa. 98; Gallagher v. Whitney, 147 Pa. 184; Sharpsville Furnace Co. v. Snyder, 223 Pa. 372; Danforth v. Walker, 40 Vt. 257; River Spinning Co. v. Atlantic Mills, 155 Fed. Repr. 456.

The loss of profit to defendants caused by plaintiffs' breach was within the reasonable contemplation of the parties when they entered into the contract: Adams Express Co. v. Egbert, 36 Pa. 360; Clyde Coal Co. v. R. R. Co., 226 Pa. 391.

Plaintiffs are estopped to allege that defendants should have realized the market value for the ore because defendants lost all opportunity of so doing through complying with plaintiffs' express request to them to obtain a postponement of the time for deliveries from the mine owner, which resulted in plaintiffs' continued failure to procure vessels and the mine owners' cancellation of the tonnage.

*Lewis Lawrence Smith*, for appellees.—Generally, in executory contracts of sale of goods, the measure of damages for a refusal to receive the goods sold is the difference between the contract price and the market price at the place appointed for delivery, at the date of the breach: Unexcelled Fire Works Co. v. Polites, 130 Pa. 536; Guillon v. Earnshaw, 169 Pa. 463; Kinports v. Breon, 193 Pa. 309; Saxe v. Lumber Co., 159 N. Y. 371; Sharpsville Furnace Co. v. Snyder, 223 Pa. 372; Jones v. Jennings, 168 Pa. 493; Field v. Schuster, 26 Pa. Superior Ct. 82.

The exceptions to the general rule of damages arise only where there is no market value standard or where the parties have contracted on a different basis: Kinports v. Breon, 193 Pa. 309; Puritan Coke Co. v. Clark, 204 Pa. 556; Mitchell v. Baker, 208 Pa. 377; Mayer Brick Co. v. Kennedy, 230 Pa. 98.

While in executory contracts of sale special profits are not necessarily excluded because they are profits, yet if allowed at all, it is because the ordinary measure of damages is inadequate or impossible of application, and the profits themselves must have been an integral part of the contract itself. Profits from a subcontract cannot be recovered unless the sale is made expressly

with reference to such subcontract: Fergusson v. Telegraph Co., 178 Pa. 377; Adams Express Co. v. Egbert, 36 Pa. 360; Pennypacker v. Jones, 106 Pa. 237; C., C., C. & St. L. Ry. Co. v. Wood, 189 Ill. 352; Wolcott v. Mount, 36 N. J. L. 262.

OPINION BY ORLADY, J., July 16, 1913:

The opinion of the court below filed on discharging a rule for a new trial so clearly and fully answers the appellant's argument in this court that it is unnecessary to further review the case.

The judgment is affirmed.